Filed 3/25/13  In re K.S. CA3

<u>**NOT TO BE PUBLISHED**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# THIRD APPELLATE DISTRICT

## (Yolo)

**----**

| | |
|---|---|
| In re K.S., a Person Coming Under the Juvenile Court Law. | C068823 |
| YOLO COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL SERVICES, | (Super. Ct. No. JV10-188) |
| Plaintiff and Respondent, | |
| v. | |
| J.S., | |
| Defendant and Appellant. | |
| In re N.K, a Person Coming Under the Juvenile Court Law. | C068824 |
| YOLO COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL SERVICES, | (Super. Ct. No. JV10-189) |
| Plaintiff and Respondent, | |
| v. | |
| J.S., | |
| Defendant and Appellant. | |

1

J.S. (mother) appeals from six-month review orders by the juvenile court as to her minor daughters K.S. and N.K. (Welf. & Inst. Code, §§ 366.21, subd. (e), 395.) The court continued K.S.'s placement in foster care and ordered further reunification services to mother, including conjoint counseling for mother and K.S. As to N.K., who was placed with her father B.K. at disposition pursuant to Welfare and Institutions Code section 361.2, subdivisions (a) and (b)(1), the court granted sole legal and physical custody to B.K. and terminated jurisdiction.

On this appeal, mother contends only that the juvenile court abused its discretion and violated due process by refusing to admit audiotapes made by mother and offered by her as impeachment evidence. According to mother, the court's error was prejudicial because this evidence, if admitted, could have "painted a very different" (more favorable) picture of the relationship between her and the minors; therefore, she requests remand of both minors' cases for rehearing.

Respondent Yolo County Department of Employment and Social Services (the Department) replies that the audiotapes were properly excluded because (1) the communications recorded were confidential and the other parties did not consent to being recorded (Pen. Code, § 632); (2) the audiotapes might have been incomplete or selectively edited; (3) they were minimally probative and would have consumed undue time (Evid. Code, § 352); and (4) mother never provided the parties with copies or transcripts of the audiotapes (Evid. Code, § 250; Cal. Rules of Court, rule 2.1040(b)).[1]

We conclude the Department's last point is sufficient to uphold the juvenile court's rulings. Therefore, we shall affirm on that basis without reaching the parties' other arguments.

---

[1] Further references to rules are to the California Rules of Court.

## FACTUAL AND PROCEDURAL BACKGROUND

We decided mother's appeal from the juvenile court's dispositional and postdisposition status review orders in a prior opinion, of which we take judicial notice. (*In re K.S.* (Feb. 14, 2012, C066512) [nonpub. opn.].) We generally draw the facts from our prior opinion for the period covered therein.

Because the single issue raised in the present appeal does not go to the substance of the juvenile court's rulings, we focus on the facts relevant to that issue and do not attempt to give a full summary of the proceedings' complex history.

In April and May 2010, when N.K. was 15 years old and K.S. was 14 years old, the Department alleged that mother had repeatedly used a dangerous form of corporal punishment as "discipline" on both minors, and might be facing criminal charges as to N.K.[2] The juvenile court took jurisdiction over the minors in June 2010.

It soon became apparent that mother made a practice of tape-recording persons involved in the case, even if they had not consented to such recording. When a protective custody warrant was issued as to N.K., mother attempted to secretly record the warrant's execution. K.S. reported that mother routinely recorded her interactions with the minors. Mother admitted that she recorded her conversations with the minors and the social worker, among others, ostensibly to protect herself against false accusations.

At the start of the dispositional hearings, the juvenile court informed mother that tape-recording a person without permission is a crime in California. Thereafter, the court learned that mother had tried to record the courtroom proceedings surreptitiously. After

---

[2] Criminal charges were filed, but were dismissed after N.K. failed to testify.

granting her counsel's request to be relieved, the court allowed mother to proceed in propria persona.[3]

On September 29, 2010, the juvenile court made the following dispositional orders: N.K. was placed out of state with B.K., the nonoffending noncustodial parent. K.S. (who was not B.K.'s biological or adopted child) was to remain in foster placement. As to both minors, the court ordered reunification services for mother, including programs in domestic violence, anger management, parenting, counseling "as approved by the Department," and conjoint counseling with the minors after the parties had agreed on a counselor for that purpose. The court also ordered visitation of up to two hours a week as to K.S. and at least four hours per month as to N.K.

An early review hearing as to visitation and conjoint counseling was set for November 3, 2010. By that time, however, the juvenile court judge (Judge Basha) had recused himself, and the scheduled hearing did not take place on that date. In a report filed for the aborted hearing, the Department stated that K.S. did not want to do conjoint counseling except as a substitute for visitation and K.S.'s therapist did not think K.S. was ready for conjoint counseling.

At subsequent hearings, the juvenile court (Judge White) ordered that conjoint counseling would take place only when K.S.'s therapist considered it appropriate. The court also maintained the existing visitation orders.[4]

On January 19, 2011, the juvenile court ordered: "[M]other is not to record any interactions with either minor absent an express order of this court." The court specified

---

[3] Except for one brief period prior to disposition, mother has remained in propria persona in the juvenile court (though represented by counsel on appeal).

[4] We consolidated mother's appeals from the dispositional orders and the subsequent orders, and affirmed all the challenged findings and orders in *In re K.S., supra,* C066512.

4

that violation of the order would result in contempt of court. The court also admonished mother not to record conversations with any other persons.

The juvenile court held a hearing on March 4, 2011, on the Department's request to modify visitation. Despite the history of court orders and admonitions to mother against recording, at this hearing and almost every later hearing mother offered her self-made audiotapes in evidence to rebut adverse testimony.

According to Bobbie Stewart, who supervised visits from mid-December 2010 through mid-February 2011, the first two visits, which occurred in public places in downtown Davis, went poorly because mother did not respond to the minors' statements or feelings; the second visit ended with the minors walking away and mother becoming extremely angry with Stewart. Stewart decided to conduct further visits in her office.

On December 19, 2010, K.S. became ill during the visit; there were no verbal greetings or goodbyes. On January 7, 2011, there were no verbal or physical greetings; mother did not respond to any topic of conversation K.S. brought up or respect any boundaries K.S. tried to set. On January 10, 2011, mother brought food, which was not the kind K.S. had requested, then argued with K.S. about her desire to get a driver's permit. On January 16, 2011, mother tickled K.S. after being told to stop, then ordered K.S. to take a time-out (in violation of previously explained rules for visitation) and got angry when K.S. would not do so. On February 14, 2011, after a highly emotional argument between mother and K.S., Stewart decided to end the visit. She asked mother to leave because mother was escalating the tension. Mother not only refused to leave, but put her hand in Stewart's face while continuing to "verbally assault" K.S. Stewart called the police; the dispatcher heard mother yelling in the background. Mother left before the police came. K.S. was lying on the couch "in a fetal position, sobbing."

Mother began her cross-examination of Stewart at the March 4, 2011 hearing by stating that there were audiotapes of the visits. The Department objected on grounds of

5

relevance and cited the anti-recording order. The court sustained the objection. Mother asserted that her tapes were made before the court's order and could impeach Stewart's testimony.[5] When the court repeated its ruling, mother said she was "simply going to submit the audiotapes" and would ask no further questions. The court asked on what authority she proposed to submit the tapes. Mother cited only Evidence Code section 412.[6]

The Department's counsel stated: "[A]*udiotapes can't be introduced without providing a transcript first to the parties*." (Italics added.) Counsel added that the Department had not been aware that mother was audiotaping until the date the juvenile court ordered her not to do so; therefore, it appeared the tapes had been illegally made without the other parties' consent and were inadmissible on that basis. K.S.'s counsel joined in the Department's objection on all stated grounds.

Mother then cited Penal Code section 632,[7] asserting that it amounts to "a one-party consent law in cases where conversations are not confidential at the very outset, the

---

[5] Mother said she had not taped the February 14, 2011 visit, the only one that occurred after the order was made.

[6] Evidence Code section 412 provides: "If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust."

[7] Penal Code section 632 provides as relevant:

"(a) Every person who, intentionally and without the consent of all parties to a confidential communication, by means of any . . . recording device, . . . records the confidential communication, . . . shall be punished by [a fine and/or imprisonment ]. . . .

"(b) The term 'person' includes an individual, . . . but excludes an individual known by all parties to a confidential communication to be . . . recording the communication.

"(c) The term 'confidential communication' includes any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any . . . proceeding open to the public, or in any other circumstance in

visits." Furthermore, mother asserted: "The conversations I have with social workers are absolutely understood at the outset to be nonconfidential and even if . . . the conversation between the parties are [*sic*] confidential, the party who has been taped first has to establish harm." Finally, mother explained that the audiotapes would allow her to "provide an accurate accounting to demonstrate not just things that were said but tones, the positive nature of the visits, the fact that I did greet my children, kiss my children, hug my children."

The court reiterated its ruling, sustaining the objections to the audiotapes.

Later in the hearing, Debra Wiegel, a family therapist who had worked with mother and the minors before these proceedings began, testified that mother had allowed her to hear the audiotape of the December 30, 2010 visit. When mother asked Wiegel if it was consistent with the social worker's notes on the visit, the Department's counsel objected to any question based on the tapes, and the court sustained the objection. Mother asserted: "The information is admissible by law." The court reiterated its ruling. Mother continued to argue her position, citing Evidence Code section 412, asserting that any and all statements of adverse witnesses about mother's behavior were or would be

---

which the parties to the communication may reasonably expect that the communication may be . . . recorded.

   "(d) Except as proof in an action or prosecution for violation of this section, no evidence obtained as a result of . . . recording a confidential communication in violation of this section shall be admissible in any judicial . . . proceeding."

   Although mother repeatedly cited this provision, she did not cite any case law holding that parent-child visits or parent-social worker conversations in dependency proceedings are inherently nonconfidential, that one party to such communications can render them nonconfidential by announcing the intent to record them even over the other parties' objection, or that the party who objects to the admission of illegally obtained audiotapes must "establish harm" to obtain a ruling that this evidence is inadmissible. Nor do we know of any case law mother could have cited to support those propositions.

7

"crap," and claiming that the Department opposed "transparency." The court did not change its ruling.

In mother's own testimony at the March 4, 2011 hearing, she cited the audiotapes as evidence that she greeted and acknowledged K.S. at every visit. When the court asked if mother wanted to present any further evidence, mother again demanded the admission of the audiotapes; the court again repeated its ruling.

On April 21, 2011, the court and the parties held a trial readiness conference for the contested six-month review hearing, set for April 27, 2011. Mother said she planned to introduce audiotapes. The court replied that mother would have to prove the tapes were admissible through an Evidence Code section 402 hearing.

Because some of mother's proposed witnesses struck the court as unlikely to have evidence relevant to this stage of the proceeding, the court required mother to file her witness list in writing with an offer of proof as to each witness. In addition, the court stated: "If you're planning to offer videotapes, audiotapes exist of what [*sic*]. I don't need a transcript. I just need to understand [the ] tape[,] meaning give date, who's reported, what you expect to offer that tape for, and we're all going to have to have [a] hearing whether or not those things are admissible. So bring the tapes with you, that way we can clear out housekeeping rules of evidence [*sic*]."

On April 26, 2011, the Department filed written opposition to admitting any recordings, raising the following grounds: (1) The recorded conversations were confidential under Penal Code section 632 and the parties who were recorded did not consent to being recorded; thus, the recordings were illegally obtained. (2) There was no certainty that the recordings were complete and unedited. (3) The recorded conversations had limited evidentiary value because they would not reflect body language and nonverbal gestures. (4) Mother had not provided the parties with copies of any recording

8

in advance of the hearings. (5) Mother had not provided transcripts of the recordings, as required by rule 2.1040 and Evidence Code section 250.

So far as we can discern from our inspection of the record and mother's appellate briefing, mother did not respond coherently to these arguments in a writing.

On April 27, 2011, the first day of the contested six-month review hearings,[8] mother again questioned Debra Wiegel about the audiotape of the December 30, 2010 visit; the court again sustained the Department's objection. The court pointed out that, unless authenticated, mother's recordings were hearsay, and there was no showing as to what recording Wiegel had heard. The court explained to mother: "I need to know which recording, what are the circumstances, what are your arguments for admitting it, then I have to hear the arguments in opposition."

N.K.'s counsel stated: "*Just for the record, Your Honor, I have not received any audiotape or videotape from* [*mother*]." (Italics added.) K.S.'s counsel objected to admitting the recordings on grounds of confidentiality. B.K.'s counsel joined in the objections.

The court ruled: "At this time any of these recordings are not admissible. [¶] If you have the recordings and you want me to listen to them in camera and we have a hearing on the admissibility of those tapes, we can make a full record on it, I would be happy to do that. [¶] But what I know of the tapes right now is: I don't know what Ms. Wiegel heard. I don't know if it is a complete recording. There's [the] issue of the confidentiality of those meetings. There's the objection of all the parties. [¶] So right

---

[8] The hearings from April 27 through June 15, 2011, concerned N.K.'s case; the hearings beginning on June 17, 2011, concerned K.S.'s case. Despite the court's attempts to maintain order, however, there was a significant spill-over of matters from K.S.'s case into the earlier hearings.

now, Ms. Wiegel is not going to be allowed to testify about her impressions based on those audiotapes."

On May 6, 2011, the next day of the contested six-month review hearings, the Department's counsel mentioned the recordings. The court replied that it would ask mother as to each witness in turn whether she intended to offer such evidence. The court noted counsel's position that even if a specific recording was found admissible, the parties would still need to review the recording and to have a transcript of it.

Mother asked Kathryn Jaeger, her court-ordered therapist, whether Jaeger knew that mother had recorded her visits with the minors; Jaeger said she did. (Jaeger opined that it would be acceptable to tape visits to resolve discrepancies as to what had occurred, as long as all parties to the conversations knew they were being taped and the court approved it.) When mother referred to "direct evidence" (i.e., the tapes), opposing counsel objected and the court sustained the objections.

On May 27, 2011, the fourth day of the contested six-month review hearings, mother complained that she had called the court clerk to arrange to play her recordings and had not been accommodated. The court explained that the issue was not accommodation, but admissibility.

While cross-examining N.K., mother asked if N.K. knew that there were audiotapes of their visits. N.K. said she did not.

Mother offered to submit the tapes to "demonstrate the nonconfrontational nature of the visits." The court asked mother to name a specific date and the parties who were present. Mother specified the recording of the visit of December 17, 2010, which took place in downtown Davis, stated that she had made the recording, and identified the parties as herself, Bobbie Stewart, and the minors. Opposing counsel renewed all

10

previous objections, including the objection that they had not received copies or transcripts of any tapes.

The court asked mother to respond as to confidentiality and lack of consent. Mother asserted, without argument or citation to case law: "Section 632 of the Penal Code makes it quite clear that these conversations are not remotely confidential." Opposing counsel replied that the conversations were confidential even if they occurred in a public place because they were engaged in for purposes of visitation, the minors and Stewart did not know of or consent to the taping, and they would not have expected others to be listening in on the conversation.[9] Mother retorted that because this recording was made on the street and anyone could have overheard the conversation, "it [(presumably confidentiality)] doesn't even apply to all of this stuff"; she also cited Evidence Code section 412 again.

The court ruled: "The objections are all sustained. I find that that was a confidential communication [and] that the objections are valid." The court added that if mother wanted to submit any other audiotapes, there would have to be an Evidence Code section 402 hearing to determine their admissibility, but mother's offer of proof as to the December 17, 2010 tape did not surmount the objections.

At the continuation of the contested six-month review hearings on June 3, 2011, while cross-examining social worker Carrie Fleig, mother offered to submit an audiotape to rebut Fleig's testimony as to a meeting in February 2011 about K.S.'s educational progress; the persons said to be recorded included mother, Fleig, Jaeger, and several teachers.

---

[9] The Department's counsel added that for purposes of Penal Code section 632, the recording device itself counts as "someone else [who] is listening," so that if the other parties are not aware of the device and have not consented to its use, that is a further ground for finding the conversation to be confidential.

11

K.S.'s counsel objected that the parties had not been provided with the audiotape or any transcript. Mother asserted: "Rebuttal evidence is not required to be submitted . . . prior to— as part of discovery." The court replied: "*Even though it's rebuttal evidence, there does have to be a presentation of a transcript.* There does have to be a showing that the parties at this meeting consented to this tape." (Italics added.)

Responding only to the second point, mother claimed that Penal Code section 632 did not require a showing of consent for this tape. (Asked "which portion of Section 632" she relied on, mother did not cite any particular portion.) Mother also asserted that she did not need to obtain the consent of all parties to the recording because she had "informed" one party that she would be taping the meeting. She added: "This has already been ruled on by a federal court who found that, from a previous OCR [*sic*] complaint, that actually found that that was perfectly legal under codes."[10]

The court said: "*I will allow you to submit a transcript of the tape.*" Mother answered: "*I don't have a transcript.*" The court replied: "*Well, then that's the first impediment to admitting it and using it at this hearing . . . .* [¶] . . . [¶] [T]apes . . . don't come in unless there's a showing that they don't violate the confidentiality concerns, that it meets all the evidentiary requirements for presentation of audiotapes, and we have an evidentiary [Evidence Code section] 402 hearing on whether or not this is permissible. There are objections to the presentation of these tapes. [¶] So at least for the purposes of this particular moment since you're not prepared to do that, as I understand, then I'm not permitting you to introduce that tape at this time." (Italics added.)

Mother asked Fleig if she objected to their conversations being recorded; Fleig said she did. Asked if she objected to visits being recorded, Fleig said the court had ruled against it and it should not be done secretly by one party.

---

[10] Nothing in the record clarifies this assertion.

Mother asserted she would submit her audiotapes to refute the Department's claim that returning K.S. to her custody would be detrimental to the minor. The court repeated that there would have to be an Evidence Code section 402 hearing on the admissibility of any tape. Mother requested such a hearing.[11] A discussion followed on scheduling and witnesses, after which mother stated her intention to submit her own declaration to the court rather than continue with cross-examination of Fleig.

At the continuation of the contested six-month review hearings on June 15, 2011, while questioning Phonecia Stone on redirect exam, a social worker who had supervised visits, mother sought to question her about recording and proposed to play tapes of the visits. The court sustained opposing counsels' objections and denied the request.

When the Department's six-month review report was offered in evidence, mother objected to the admission of its "hearsay" about visits because her tapes had not been admitted. K.S.'s counsel objected again that she still had no copies or transcripts of any tapes. Mother replied that opposing counsel could have subpoenaed the tapes or requested them in discovery. The court noted that it had "gone over and over again" the requirements for the recordings to be presented to the court and pointed out: "*We have ruled on this before, and* [*counsel*] *is reiterating some of the impediments to it*." (Italics added.)

At the hearing of June 20, 2011 (the second day of the contested six-month review hearing in K.S.'s case), mother again questioned social worker Stone about the tapes of

---

**11**  A formal Evidence Code section 402 was not conducted. However, the record reflects that the extensive contested six-month review hearings, held over nine days between April 27, 2011 and June 23, 2011, were one, long section 402 hearing. The juvenile court was faced throughout the proceedings with determining the admissibility of evidence not only of mother's proffered recordings but with the substance of her submitted declarations and voluminous exhibits.

13

the visits she had supervised and sought to offer them in evidence. The court reaffirmed its prior rulings.

Later, mother offered into evidence her recording of the meeting in which Fleig and Jaeger had taken part. After argument, the court denied the request. As to transcripts, mother asserted that she lacked the financial resources to make them and hoped the ruling was not based on that alone. The court replied: "*That's one of many grounds,* but certainly not the most pertinent ground." (Italics added.)

Notwithstanding all of the court's rulings up to this point, mother offered to submit her audiotapes many more times before the contested six-month review hearing ended, always without success. Finally, in closing argument mother asserted that the audiotapes would show her and the minors laughing and joking and repeatedly saying "I love you."

## DISCUSSION

The parties devote most of their appellate briefing to the issues arising under Penal Code section 632. We need not reach those issues, however, because an alternative ground on which the juvenile court excluded mother's audiotapes— her failure to provide copies or transcripts to the other parties and the court—is sufficient to affirm the court's ruling.

A "writing" includes "every . . . means of recording upon any tangible thing . . . , and any record thereby created." (Evid. Code, § 250.) A "duplicate" includes "a counterpart produced . . . by mechanical or electronic rerecording." (Evid. Code, § 260.)

A writing must be authenticated before it may be received in evidence. (Evid. Code, § 1401, subd. (a).) "Authentication of a writing" means proving that it is the writing that its proponent claims it to be. (Evid. Code, § 1400.)

14

Rule 2.1040(b) provides as relevant:

"(1) Except as provided in (2) and (3), before a party may present or offer into evidence any electronic sound or sound-and-video recording not covered under (a) [deposition or other prior testimony], the party must provide to the court and to opposing parties a transcript of the electronic recording and provide opposing parties with a duplicate of the electronic recording, as defined in Evidence Code section 260. The transcript may be prepared by the party presenting or offering the recording into evidence; a certified transcript is not required. [¶] . . . [¶]

"(3) No transcript is required to be provided under (1): [¶] . . . [¶]

"(C) If, for good cause, the trial judge orders that a transcript is not required."[12]

Here, in opposing mother's proffer of her audiotapes, the Department and other parties asserted inter alia that she had not provided them with a transcript or a duplicate of any audiotape, as expressly required by rule 2.1040(b). They repeatedly raised this objection, and the court repeatedly found it valid.

Appellate counsel does not renew mother's arguments below against compliance with the rule, which we therefore deem abandoned. Instead, counsel offers two new arguments: (1) "[T]he [juvenile] court specifically informed mother no transcript would be required." (2) It would have been futile to comply with the rule because "the court made it clear the controlling ground for excluding the audiotapes was the [Penal Code] section 632 issue, so the evidence would have been excluded even if a transcript had been provided." We are not persuaded.

---

**12** It may be "good cause" under rule 2.1040(b)(3)(C) if "the party presenting or offering the electronic recording into evidence lacks the *capacity* to prepare a transcript" (Advisory Com. com., 23 pt. 1A West's Ann. Codes, Rules (2013 supp.) foll. rule 2.1040, p. 61 [par. entitled "Subdivision (b)(3)(C)"], italics added). The quoted comment does not define "capacity," however, and there is no case law construing the rule.

15

Appellate counsel's first argument misstates the record. Counsel cites only to the passage set out above from the trial readiness conference of April 21, 2011, in which the juvenile court told mother that her written offer of proof as to audiotapes need not include transcripts because the court merely wanted to find out, as a precondition to holding Evidence Code section 402 hearings on the tapes, exactly what tapes mother sought to introduce and for what purposes. By the time the court said this, it had already sustained objections to audiotapes which included the objection that no copies or transcripts had been furnished to the parties, and it did so several times afterward, expressly citing this ground for excluding the tapes. (Notably, mother never relied on the court's remark in the trial court to justify her noncompliance with rule 2.1040(b).)

Appellate counsel's second argument puts the cart before the horse. Although the court tentatively concluded from the parties' arguments alone that the tapes were inadmissible under Penal Code section 632, the court repeatedly offered to hold evidentiary hearings on that issue. But, as the court explained, it could not do so until mother complied with rule 2.1040(b), since complying with the rule or showing good cause for failure to comply is a precondition to considering the admissibility of any recordings within the rule's scope.[13] Because mother did not do either, her claim that it would have been futile to comply with the rule is purely speculative.

Because the juvenile court's ruling excluding the tapes for noncompliance with rule 2.1040(b) was clearly correct, we reject mother's claim that this ruling somehow

---

[13] Even assuming that lack of financial resources (which mother finally asserted) might show a lack of "capacity to prepare a transcript" (rule 2.1040(b)(3)(C)), mother did not offer to prove her alleged lack of financial resources in writing. In any event, we think it unlikely the juvenile court would have deemed mother's inability to pay for transcribing multiple tapes which she herself made, against repeated orders and admonitions by two different juvenile court judges and the clear wishes of all other recorded parties who gave their views on the subject, to constitute good cause for failing to comply with rule 2.1040(b).

violated due process. A parent's due process right to present evidence in a dependency proceeding is limited to presenting relevant evidence of significant probative value. (*In re J.F.* (2011) 196 Cal.App.4th 321, 332; see *People v. Marshall* (1996) 13 Cal.4th 799, 836.) Since mother's noncompliance with rule 2.1040(b) precluded any chance to rebut the other parties' objections to the tapes' admissibility, she cannot show that she was deprived of the chance to present admissible, relevant, and significantly probative evidence.

Finally, even though we have found no error in the juvenile court's exclusion of the audiotapes, any error in doing so would necessarily be harmless on this record. Mother's claim that the tapes would have shown her relationships with the minors in a more favorable light, or that they would have proved other witnesses were lying about what went on during visits, is not only pure speculation, but is inconsistent with the overwhelming weight of the evidence presented during the protracted six-month review hearings— including that given by the minors themselves.

N.K. testified that the visits with mother were "stressful" and she felt "like [she is] just faking the entire thing, like just be as polite as you can, just get the hour done with." N.K. failed to come down from Seattle for a visit in March 2011 because she felt so reluctant to visit mother that she could not even get on the plane. This scheduled visit coincided with the point in the criminal proceedings against mother when N.K. would have had to testify; therefore, she did not do so. Asked if there was something the Department could do to make her feel comfortable with the visits, she said she "[didn't] think so." She would visit if the court said she had to, but she did not want even phone or e-mail contact with mother; she was not comfortable visiting even with another person present because she always expected stress and "confrontation."

K.S. testified that visits with mother were "[a]wkward and not pleasant. [¶] . . . [¶] We often argued and got upset with each other." She described the February 14, 2011

17

visit similarly to the way Bobbie Stewart had done.  The visits in public places were "worse" in terms of mother's behavior than those in Stewart's office.  Asked what the Department could do to make visits go better, she replied:  "Not have them."  Throughout her testimony, K.S. referred to mother by her first name "[b]ecause I don't feel like she is my mom."

In light of this testimony, as well as that given by the visits' supervisors, any possibility that audiotapes would have shown mother's relationship with the minors in a more favorable light or would have exposed all other persons' accounts of the visits as false is exceedingly small.

For all of the above reasons, mother has shown no grounds for reversal as to either minor from the exclusion of her audiotapes.

## DISPOSITION

The six-month review orders are affirmed as to both minors.


                                                            BUTZ                    , Acting P. J.


We concur:



          MURRAY          , J.



          DUARTE          , J.



18